IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

AFFIDAVIT FOR SEARCH WARRANT OF INTERNAL REVENUE SERVICE, CRIMINAL INVESTIGATION SPECIAL AGENT JENNIFER HIGGINS

**I, Jennifer A. Higgins, being duly sworn, do depose and say:**

1. I have been employed as a Special Agent of the Internal Revenue Service, Criminal Investigation in Akron, Ohio, since September 1987.  I earned a Bachelor of Science degree in Accounting from the University of Akron in 1984.

2. I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia in May 1988.  I graduated from Advanced Special Agent Training, held at Federal Law Enforcement Training Center, Glynco, Georgia in May 1996.  In these two programs, I studied a variety of law enforcement, criminal investigator, and tax crime issues, including search and seizure, violations of the Internal Revenue Code, and Internal Revenue Service procedures and policies in criminal investigations. My current responsibilities as an IRS Special Agent include the investigation of possible criminal violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (Title 31, United States Code), and related offenses.

3. I have assisted in dozens of search warrants executed by Federal and State law enforcement agencies, including the Internal Revenue Service Criminal Investigations, Federal Bureau of Investigation, Drug Enforcement Administration, Homeland Security Investigations, Summit County Sheriff's Office and Akron Police Department.  I have functioned as the seizing agent for several of those search warrants.  The seizing agent is responsible for ensuring that the evidence seized falls within the scope of the search warrant.  I have also functioned as the team leader for many search warrants, which includes planning, executing, and making all operational decisions on-site regarding the situation discovered on scene, including decisions on what items are relevant to the investigation and included within the scope of the search warrant.

4. Based on my knowledge, training , and more than 25 years of experience regarding criminal violations of the Internal Revenue Code and other tax-related crimes, I know that:

   a. Owners of automobile dealerships in the "buy here, pay here" (self-financing) business, receive much of their daily revenue in the form of currency.  (Currency is described as Federal Reserve Notes in the form of U.S Dollars).  Many of the businesses receiving daily currency revenue in excess of $10,000, structure their bank deposits.  They do this so as to cause the bank not to file the Currency Transaction Report in order to

**EXHIBIT A**

avoid any scrutiny of the large currency transactions by the Internal Revenue Service and other law enforcement agencies.

b. Owners of automobile dealerships in the "buy here, pay here" business, offer financing to their customers and therefore are required by Federal and State law to maintain customer information or a "deal jacket" for each sale, including but not limited to, purchase invoice, sales agreement, loan application, copy of the vehicle title, copy of the buyer's drivers license, amount of sales tax paid, odometer reading and payment history.

c. Owners of automobile dealerships in the "buy here, pay here" business, sometimes allow individuals with illegal sources of income, such as drug dealers, to purchase automobiles using currency of over $10,000 and the owner fails to report the transaction on Form 8300 as required by federal law.

d. Owners of automobile dealerships in the "buy here, pay here" business, sometime cater to individuals with illegal sources of income, such as drug dealers, by maintaining an inventory of "high- end" used automobiles. "High-end" automobiles include Mercedes Benz, Lexus, Infiniti, Hummer, BMW, Cadillac, Land Rover, Jaguar, Porsche and Volvo.

e. Nearly all businesses have a profit motive, and those businesses generally keep books and records at the primary place of their operations for the purpose of documenting items of income and expense, in order to determine the business' profitability, and to determine the resources available to continue business operations.

f. Owners and operators of small businesses oftentimes maintain books and records in locations other than the primary place of their operations. Such locations include home offices, off-site storage facilities, or portable/laptop computers.

g. Owners and operators of currency intensive businesses, sometimes keep multiple sets of books and records, which are used for different purposes. Typically where multiple sets of books and records exist, the books and records containing information which is provided to the Internal Revenue Service are less complete than those used by the business owners and operators to determine business profitability and operational resources.

h. Many businesses receiving large amounts of their revenue in the form of currency do not report all of the currency received to the Internal Revenue Service for the purpose of determining income tax due under the Internal Revenue Code.

i. Businesses that are currency intensive oftentimes pay employees, wholly or partially, with currency. Those businesses typically do not report all

employee earnings to the Internal Revenue Service for the purpose of determining payroll taxes due under the Federal Insurance Contributions Act.

## I. SYNOPSIS OF THE INVESTIGATION

5.  The investigation of Davood Haghighi (Haghighi), Behnam Haghnazari (Haghnazari) and their corporate entities revealed they cater to drug dealers by selling them "high-end" used automobiles and concealing the true owner, source of funds or the amount of the sale.  The investigation was initiated as a result of an ongoing Organized Crime Drug Enforcement Task Force (OCDETF) investigation being conducted by the Northern District of Ohio, United States Attorney's Office.  The participating law enforcement agencies include the Drug Enforcement Administration (DEA), Ohio Bureau of Criminal Identification and Investigation (BCI&I), Homeland Security Investigations (HSI), Internal Revenue Service-Criminal Investigation (IRS-CI), Medina County Metro Drug Task Force (MCDTF) and Stark County Metro Drug Task Force (SCMDTF), Portage County Drug Task Force (PCDTF) and the Ohio Department of Taxation, Criminal Enforcement Division.

6.  The evidence obtained to date shows that Haghighi and Haghnazari are the owners/operators of Globe Auto Center Inc. (GAC), Globe Auto Sales Inc. (GAS) and Auto Site Inc. (AS).  Both Haghighi and Haghnazari knowingly sell automobiles to drug traffickers and others involved in illegal activity.  The investigation has also shown that Haghighi and Haghnazari accept cash payments greater than $10,000 in the sale of automobiles to individuals involved in drug activity and fail to file the required Forms 8300 to the Internal Revenue Service for large cash transactions.  In order to conceal the true ownership of these automobiles, Haghighi and Haghnazari prepare documents for the sale of these automobiles which they know are false and incorrect, which include placing the automobiles in a nominee name in an attempt to conceal the true ownership and the actual sales price.  In addition, Haghighi and Haghnazari have structured cash deposits into bank accounts held at JP Morgan Chase Bank (Chase Bank), PNC Bank and Seven Seventeen Credit Union (SSCU), in an effort to avoid the filing of Currency Transaction Reports (CTRs), which financial institutions are required to file for currency transactions in excess of $10,000.

7.  Chase Bank and SSCU records show substantial bank deposits for GAS and AS, however no income has been reported to the Internal Revenue Service.  Tax records reveal that GAC has reported substantial losses for the past four years.  Bank records also reveal extensive commingling of bank deposits between GAC, GAS and AS.  Also the evidence shows that Haghighi and Haghnazari have unreported income.

8.  The evidence being sought by search warrant is not available to this investigation through other investigative means.  Since most potential witnesses are drug dealers and others engaged in criminal activity, it is unreasonable to expect

genuine cooperation.  Records dealing with cash transactions seldom leave direct paper trails within the financial system, making it difficult to reconstruct accurate financial information using subpoena power alone.  For those reasons, it is believed that the items being sought by this search warrant affidavit would not otherwise be available to the investigation.

## II. CRIMINAL STATUES VIOLATED

9.  I make this affidavit believing there is probable cause that Haghighi and Haghnazari have committed and continue to commit the following criminal offenses against the United States:

   a.  Title 18, United States Code, Section 1956(a)(1)(A)(i):

   Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of the specified unlawful activity shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

   b.  Title 18, United States Code, Section 1956 (a)(1)(B)(i):

   Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

   c.  Title 18, United States Code, Section 1956(a)(1)(B) (ii):

   Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or part to avoid a transaction reporting under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

d.  Title 18, United States Code, Section 1956 (a)(3)(A),(B),(C):

Whoever, with the intent
   i.  to promote the carrying on of specified unlawful activity;

   ii. to conceal or disguise the nature, location, source, ownership, or
       control of property believed to be proceeds of specified unlawful
       activity; or

   iii. To avoid a transaction reporting requirement under State or Federal
        law, conducts or attempts to conduct a financial transaction
        involving property represented to be the proceeds of specified
        unlawful activity, or property used to conduct or facilitate specified
        unlawful activity, shall be fined under this title or imprisoned for not
        more than 20 years or both.

e.  Title 18, United States Code, Section 1956(h)

Any person who conspires to commit any offense defined in this section or
section 1957 shall be subject to the same penalties as those prescribed
for the offense the commission of which was the object of the conspiracy.

f.  Title 18, United States Code, Section 1957:

Whoever, in any of the circumstances set forth in subsection (d),
knowingly engages or attempts to engage in a monetary transaction in
criminally derived property of a value greater than $10,000 and in derived
from specified unlawful activity shall be punished as provided in section
(b).  Except as provided in paragraph (2), the punishment for an offense
under this section is a fine under title 18, United States Code, or
imprisonment for not more than ten years or both.  The court may impose
an alternate fine to the imposable under paragraph (1) of not more than
twice the amount of the criminally derived property involved in the
transaction.

g.  Title 18, United States Code, Section 371:

If two or more persons conspire either to commit any offense against
the United States, or to defraud the United States, or any agency thereof
in any manner or for any purpose, and one or more of such persons do
any act to effect the object of the conspiracy, each shall be fined under
this title or imprisoned not more than five years, or both.  If, however, the
offense, the commission of which is the object of the conspiracy, is a
misdemeanor only, the punishment for such conspiracy shall not exceed
the maximum punishment provided for such misdemeanor.

h.  Title 31, United States Code Section 5313:

As promulgated under 31C.F.R. Section 1010.311, requires Federal Institutions as defined under USC 5312 to file a Currency Transaction Report for each currency transactions in excess of $10,000.

i.  Title 31, United States Code, Section 5324:

As promulgated under C.F.R. Section 1010.314 prohibits the breaking up of large currency transactions in excess of $10,000 into smaller transactions so as to avoid the reporting requirement under United States Code Section 5313.  The penalty is imprisonment for not more than 5 years and/ or a fine of $250,000.  If the structuring involves more than $100,000 in a 12-month period or is performed while violating another law of the United States the penalty is increased to imprisonment not to exceed 10 years and/or a fine of $500,000.

j.  Title 31, United States Code Section 5331 and Title 26, United States Code 6050I:

Both require a financial institution (such as an automobile dealership) who is engaged in a trade or business and receives more than $10,000 in cash in a transaction, or two or more related transactions, to report such transactions to the Federal Government.

k.  Title 26, United States Code, Section 7201:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

l.  Title 26, United States Code, Section 7202:

Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

m. Title 26, United States Code, Section 7206(1):

Any person who willfully makes and subscribes any return, statement, or
other document, which contains or is verified by a written declaration that
is made under the penalties of perjury, and which he does not believe to
be true and correct as to every material matter shall be guilty of a felony
and, upon conviction thereof, shall be fined not more than $100,000, or
imprisoned not more than three years, or both, together with the costs of
prosecution.

## III. EVIDENCE OF PROBABLE CAUSE

**Information from Confidential informants**

10. Confidential Informant 1
Confidential Informant 1 (CI-1) has been deemed a reliable and credible
informant. CI-1's information has been corroborated by federal and state law
enforcement on a number of occasions. CI-1 has also performed numerous
successful consensually monitored meetings and controlled buys under law
enforcement guidance.

11. From September 29, 2010, and continuing through the present, the Internal
Revenue Service Criminal Investigations has received information from CI-1
regarding the activities of Haghighi, Haghnazari and their businesses GAC, GAS
and AS. The information that CI-1 has provided has been corroborated through
other investigative means, including tax records, public records, bank records,
surveillance and other law enforcement records.

12. Confidential Informant 2
Confidential Informant 2 (CI-2) has been deemed a reliable and credible
informant. CI-2's information has been corroborated by federal and state law
enforcement on a number of occasions. CI-2 has also provided local law
enforcement information for a number of years. Local law enforcement has been
able to seize narcotics and confirmed CI-2's information on numerous occasions.

13. From March 22, 2012, and continuing through the present, the Internal
Revenue Service Criminal Investigations has received information from CI-2
regarding the activities of Haghighi, Haghnazari and their businesses GAC, GAS,
and AS. The information that CI-2 has provided has been corroborated through
other investigative means, including tax records, public records, bank records,
surveillance and other law enforcement records.

14. Immigration status and Origin of the businesses
According to Immigration records, Mohammad Davood Bolbol Haghighi was born
June 25, 1959 in Sharood, Iran. Haghighi first entered the United States on or
about May 21, 1979 on a Student Visa. Haghighi completed an application for
Permanent Residence on December 13, 1984, he completed an Application for

Naturalization on December 15, 2002 and he became a United States Citizen on May 12, 2004. Haghighi changed his legal name to Davood Haghighi on May 24, 2004. On the Application for Naturalization Haghighi listed himself as the President and Owner of GAC beginning in 1989 and the President and Owner of GAS beginning 1994. Haghighi married Elizabeth Anne Dodds on July 25, 1985 and he listed the date of divorce on the application for Naturalization as January 4, 1987, however there is no record of the divorce filed in the county records of Portage County, Ohio. Haghighi told CI-2 that he is still legally married.

15. According to immigration records Behnam Haghnazari was born on September 12, 1965 in Tehran, Iran. Haghnazari first entered the United States on or about June 30, 1986 on a Student Visa. Haghnazari completed an application for Permanent Residence April 13, 1992, he completed an Application for Naturalization, June 26, 2000 and he became a United States Citizen August 2, 2002. On the Application for Naturalization, Haghnazari listed himself as the Vice President of Globe Auto Center as of September 1, 1991. Haghnazari married Sogoli Akhundzadeh December 28, 2001 and they have one dependent. Sogoli Haghnazari became a United States Citizen on September 21, 2007.

16. According to records from the Ohio Secretary of State, Globe Auto Center, Inc., located at 1605 East Avenue, Akron, Ohio 44314, was incorporated November 28, 1990 and was issued corporate charter number 785521. The corporate charter was cancelled February 20, 1999 for failure to pay franchise tax. Globe Auto Sales Inc., located at 3149 State Route 59, Ravenna, Ohio, was incorporated October 13, 1994 and was issued corporate charter number 883905. The corporate charter was cancelled December 28, 1998 for failure to pay franchise tax. Globe Auto Sales Inc., located at 3001 State Route 59, Ravenna, Ohio, 44266, filed for registration of Trade Name, "Globe Auto Sales Inc.," on July 27, 2001. The Trade Name was canceled July 27, 2006 for failure to renew the registration. Auto Site Inc., located at 3001 State Route 59, Ravenna, Ohio 44266, was incorporated May 15, 2006 and issued corporate charter number 1623345. The corporate charter number for Auto Site Inc remains active. Davood Haghighi is listed as the registered agent and incorporator for all the entities.

17. According to immigration records, in 1989, Haghighi began operating GAC; a used automobile dealership located at 1605 East Avenue, Akron, Ohio 44314. Subsequently, Haghnazari started working with Haghighi and in 1991 Haghnazari became the Vice President of GAC. In 1994, Haghighi expanded his business operations and opened GAS, a used automobile dealership located at 3001 State Route 59, Ravenna, Ohio 44266.

18. According to State of Ohio records, in 2006, Haghighi began operating AS, a used automobile dealership located at 3001 State Route 59, Ravenna, Ohio 44266. GAS and AS share the same business address and the sign in front of the business reads as follows: "Globe Auto Sales: Sell, Trade, Buy, Financing Available; Auto Site Inc.: compare and save". (Because GAS and AS share the

same business address, I will reference activities common to the location as being at GAS/AS, unless otherwise noted.)

19. CI-2 knows that in 1990 or 1991, Haghighi began his business operations with GAC located at 1605 East Avenue, in Akron, Ohio. In 1994, Haghighi expanded his business to include GAS, located at 3149 State Route 59, Ravenna, Ohio. Haghighi operated GAS and allowed Haghnazari to operate GAC, however Haghighi told CI-2 that he is the owner of GAC and that he makes the major business decisions. In 1998, Haghighi relocated GAS to 3001 State Route 59, Ravenna, Ohio. CI-2 said in 2012, Haghighi purchased commercial property located at 2226-2234 East 55th Street, Cleveland, Ohio, for further expansion of the business and he has plans to allow an employee that currently works at GAS/AS to operate the new business location. County property records verify that Haghighi owns the properties at 1605 East Avenue, 3001 State Route 59 and 2226-2234 East 55th Street, which were purchased December 26, 2012.

20. CI-2 knows that in 2008, Haghighi started using the name Auto Site Inc., for the location at 3001 State Route 59, Ravenna, Ohio. CI-2 said that there was no change to business operations as a result of the additional name. CI-1 said Haghighi started using the name Auto Site Inc., because of a lawsuit.

21. Evidence has shown that GAC has approximately 50 automobiles on the lot for sale and GAS/AS has approximately 400 automobiles on the lot for sale. Bank records show that Haghighi and Haghnazari use business checks to purchase their automobile inventory from local Auto Auctions and none of the inventory is financed.

22. Haghighi and Haghnazari advertise that they offer "buy here pay here" financing, which for the customer means no credit check and in-house financing. Haghighi and Haghnazari operate self-financing businesses, which mean they are not supported by any bank or other financial institution, for their customer automobile financing. GAC, GAS and AS are operating as financial institutions as defined by Title 31 USC Section 5312.

23. CI-2 has specific knowledge that from 2000 to present, Haghighi has operated an auto repair shop located at 2899 State Route 59, Ravenna, Ohio. CI-2 said the auto repair shop is not open for the public, but is exclusively for the repair of GAS/AS customers' automobiles. CI-2 knows that a copy of each repair work order is maintained at the auto repair shop; however payments are not made at the location. CI-2 also has specific knowledge that from 2000 until 2011, Haghighi operated an auto body shop located at 2907 State Route 59, Ravenna, Ohio. The auto body shop was also for the exclusive use of customer automobiles, however in 2011, it was closed due to extensive roof damage. CI-2 knows that Haghighi uses the auto body location for the storage of a boat and other unknown items. CI-2 knows that Haghighi opened an additional auto repair location in or around March 2013. The site of the additional auto repair shop is in

the garage located behind GAS/AS business office at 3001 State Route 59, Ravenna, Ohio 44266.

24. CI-1 and C1-2 have heard Haghighi and Haghnazari refer to each other as "brother". CI-2 was told by Haghnazari that he and Haghighi are not actually brothers. CI-1 said Davood Haghighi goes by the Americanized name "Dave" and Behnam Haghnazari goes by the Americanized name "Ben".

25. Haghighi and Haghnazari's facilitation of drug and other illegal activity
The CI-1 was involved in drug trafficking from at least 1996 until 2006. During that time it was known in the drug community that Haghighi and Haghnazari owners and operators of GAS and AS (both located at 3001 State Route 59, Ravenna, Ohio) and GAC (located at 1605 East Avenue Akron, Ohio), would knowingly sell automobiles to drug dealers.

26. CI-1 was introduced to Haghighi in 1996 a by drug dealer who was known by both CI-1 and Haghighi. Soon after the introduction, CI-1 began purchasing automobiles from GAS, including a Camry, a Grand Prix and an Escalade. CI-1 dealt exclusively with Haghighi for the purchase of each automobile. The CI-1 could only recall details of the purchase of the 1999 Escalade, which was purchased in late 2002 or early 2003. The purchase price was $24,900 and CI-1 made a $10,000 currency down payment and financed the balance with a monthly payment of $525 per month. CI-1 was instructed by HAGHIHGI to put the automobile in the name of CI-1's ex-wife and CI-1 followed this instruction.

27. From 1996 to 2006, CI-1 referred at least 15 drug dealers to Haghighi and Haghnazari for the purchase of automobiles. CI-1 said a drug dealer must have a referral from a previous customer in order for Haghighi and Haghnazari to accept a cash payment of $10,000 or more. Based on CI-1's dealings and the time spent with Haghighi, CI-1 knows that a significant amount of Haghighi's customers are drug dealers from the Cleveland and Youngstown areas. The CI-1 was told by the drug dealers that Haghighi provided advice on how to conceal the true ownership and the how to conceal the amount of currency paid for the automobile. On September 29, 2010, the CI was at Globe Auto Sales and he saw three individuals that he knew were drug dealers from Cleveland, Ohio, however CI-1 did not know their real names.

28. CI-1 said Haghighi offers the service of "returning automobiles" to his drug dealer customers and in return he charges financing rates of 18 to 24 percent. The CI-1's friend, a drug dealer, had an automobile impounded pursuant to a drug related arrest. Due to the fact that GAS was the lien holder, the law enforcement agency that impounded the automobile had to notify and return the automobile to Haghighi at GAS. The CI was told by the drug dealer that Haghighi subsequently returned the automobile. CI-1 said sometime when the drug dealers have fully paid the loan, the lien by GAS remains on the title so it cannot be seized by law enforcement. Also in some instances Haghighi will sell an automobile to a drug dealer and not transfer the title. This is done so that the automobile is never

titled to the drug dealer and the automobile cannot be seized by law enforcement.

29. From 1996 to 2006, CI-1 has sold high grade marijuana and cocaine to Haghighi, which the CI-1 delivered to Haghighi at GAS, located at 3001 State Road, Ravenna, Ohio 44266.  During the same time period, CI-1 had been to Haghighi's previous personal residence at 950 South Lincoln Street, Kent, Ohio at least 20 times and has seen Haghighi use marijuana at the residence.

30. CI-1 said during 1996 through 2006, he purchased several automobiles from Haghnazari at the GAC, located at 1605 East Avenue, Akron, Ohio.  Haghnazari knew that the CI-1 was a drug dealer.  CI-1 said Haghnazari is responsible for operating GAS, when Haghighi is out the country.  On July 23, 2011, CI-1 saw Haghnazari at Skipco Auto Auction.  CI-1 told Haghnazari that he wanted to purchase a vehicle for $10,000 - $12,000 in currency but he did not want any paper work in his name.  CI-1 said that Haghnazari told CI-1 to come see him at the GAC location.

31. In early October 2010, CI-1 had a closed door meeting with Haghighi in his office at GAS/AS that was monitored and recorded by DEA.  CI-1 told Haghighi that the CI-1 wanted to purchase several high-end vehicles with a large amount of currency, for the purpose of "cleaning up" the CI's money.  Haghighi told CI-1 if you give me cash of more than $10,000, I will have to report it.  CI-1 told Haghighi that is not the way we handled the transactions in the past.  Haghighi told CI-1 that after 9/11 everything is different, the bank must report any transaction over $10,000.  Later in October 2010, the CI-1 saw Haghighi at an auto auction and Haghighi told the CI-1, "You should spend your money with me … Come see me"

32. In August 2011, CI-1 had a closed door meeting with Haghighi in his office at GAS/AS that was monitored and recorded by DEA.  CI-1 purchased an automobile from Haghighi with currency in the amount of $11,500.  Haghighi asked the CI-1 if he would take $2,000 of the currency and go to the bank to get a money order and CI-1 said he did not have time for that.  CI-1 told Haghighi that he did not want the paperwork in his name.  Haghighi told CI-1 that a name was needed because if "someone" was stopped in the vehicle, he did not want it to come back on him.  CI-1 provided Haghighi with a business name for the title.  Haghighi prepared the Assignment of Ownership section on the Certificate of Title and a Bill of Sale, both in the business name and in the amount of $8,500.  CI-1 saw Haghighi count the currency, place it into currency straps and place it in the safe located behind Haghighi's desk.

33. CI-1 was searched before and after the meeting with Haghighi so that all currency was accounted for.  I have the original Bill of Sale and Certificate of Title, dated August 19, 2011, that was completed by Haghighi.  I know that the amount the Haghighi recorded on the Bill of Sale and the Certificate of Title is $3,000 less than the actual purchase price of the automobile.  Haghighi did not

submit a Form 8300 to the Internal Revenue Service for this transaction. Bank records reveal that Haghighi did not make any currency deposits into the GAS or AS bank accounts on the August 19, 2011 or August 20, 2011, both of which were official banking days.

34. CI-2 has known Haghighi and Haghnazari since 2000 and has specific knowledge of the business activities of GAC, GAS and AS. CI-2 states that both Haghighi and Haghnazari are absolutely aware that they are selling automobiles to drug dealers because of the large currency down payments that they receive, the numerous amount of automobiles that are impounded pursuant to drug warrants, the drugs and drug related items found in the numerous amount of repossessed automobiles; and because a lot of the customers openly discuss their drug activity.

35. CI-2 said that 90 percent of Haghighi's customers at GAS/AS reside in the low income, drug infested areas of Cleveland, Ohio and when automobiles are repossessed or brought in for repair, they have an intense odor of marijuana. From 2000 to the present, CI-2 has seen substantial amounts marijuana, cocaine and unlabeled pill bottles in the automobiles that are repossessed or brought in for repair. CI-2 has seen as much as one kilogram of cocaine, in an automobile that was repossessed.

36. In March of 2012, an individual that CI-2 knew as a Ravenna area marijuana dealer (Ravenna drug dealer), brought his truck into GAS/AS for repair. CI-2 was told by the Ravenna drug dealer that he had just driven back from Florida and joked with CI-2 saying "don't look in the truck bed". CI-2 said the smell of marijuana was emitting from the truck. CI-2 opened the bed of the truck and saw 4 -5 large plastic totes and inside the totes were packages of marijuana wrapped in aluminum foil. The foil packages were concealed with an assortment of screws. While the truck was being repaired, CI-2 was told by the Ravenna drug dealer that he and Haghighi had a close relationship and that a few years ago he had built an extension onto Haghighi's residence at 1242 Lake Martin Road in Ravenna, Ohio. CI-2 identified the Ravenna drug dealer using an Ohio Bureau of Motor Vehicles (BMV) driver's license photo. BMV records revealed that the Ravenna drug dealer purchased his 2004 truck on June 17, 2011 and the lien holder is AS. A National Criminal Information Center (NCIC) records check revealed that the Ravenna drug dealer has several drug related convictions and tax records show that the Ravenna drug dealer's last filed tax return was in 2004.

37. From 2000 until April 2012, CI-2 has repossessed numerous GAS/AS automobiles for Haghighi. CI-2 said in 2008 or 2009, during the repossession of an automobile from the Cleveland area, CI-2 was followed back to the GAS/AS business office. CI-2 contacted Haghighi to report being followed. Haghighi told CI-2 that the customer had contacted him and he wanted his drugs out of the repossessed automobile. CI-2 knows that Haghighi met with the drug dealer, collected the outstanding payments on the loan and returned the automobile and the drugs to the drug dealer.

38. CI-2 said the repossession of automobiles for GAS/AS became too dangerous when guns were drawn on CI-2 by drug dealers. CI-2 stopped repossessing automobiles for GAS/AS in April 2012.

39. From 2000 to April 2012, CI-2 has seen Haghighi remove the customers' personal items including money, guns, marijuana, pills and other unknown narcotics, from repossessed automobiles. Haghighi told CI-2 that unless the customer pays the outstanding balance on the automobile loan, he keeps all the personal items.

40. From 2000 until December 2010, CI-2 has repossessed GAC automobiles for Haghnazari. CI-2 knows the area that the majority of the automobiles were repossessed from were in the low income, high crime areas of Akron. CI-2 used a tow truck for the repossessions and did not enter the interior of the automobiles.

41. From 2010 to the present, I have been told by law enforcement officials on numerous occasions that in the course of their drug investigations, that they have seized automobiles that had liens by AS or GAC. CI-2 said that Haghighi and Hagnazari are notified in writing by law enforcement officials, regarding the specific violations that resulted in the seizure of the automobile. CI-2 said even though, Haghighi and Haghnazari have knowledge of their customers' drug activity, they will return the automobile to the customer or allow the customer purchase another automobile.

42. CI-2 said in 2006, Haghighi began selling automobiles to Keith Hart (Hart), an individual that CI-2 knew as a Cleveland area drug dealer. Hart dealt exclusively with Haghighi for the financing and for making payments on numerous automobiles. Hart financed one automobile at a time, however every couple of months he would contact Haghighi and say that his automobile was "hot". This meant that law enforcement was following Hart or was suspicious of his activity. Haghighi would supply Hart with another automobile and the prior automobile would be traded-in or given to an associate to drive. According to Cuyahoga County Common Pleas Court case number 551218-11-CR, in May 2011, Hart and others were charged by the State of Ohio, with Theft, Forgery and Tampering with records. Court records disclosed that Hart and others conspired to illegally discharge motor vehicle liens that were held by Globe Auto Sales. During the investigation in August of 2008, Haghighi was interviewed by state investigators and admitted that he had allowed Hart to finance six automobiles, with a combined purchase price of over $145,000. Haghighi also admitted that two of the automobiles that Hart financed were titled in nominee names. NCIC records show that Hart has numerous drug convictions and tax records show that Hart has not filed a tax return since 2001.

43. On February 24, 2010, CI-2 saw a large bag of marijuana, a gun, a digital scale and plastic baggies inside of an automobile that was brought to the auto repair shop located at 2899 State Route 59, Ravenna, Ohio, for repair. CI-2 contacted

13

the Portage County Drug Task Force to report the items discovered in the automobile. The task force officer obtained a search warrant and impounded the automobile. The search of the automobile revealed a plastic bag containing approximately 50 grams of marijuana, a digital scale, plastic baggies and a loaded Charter Arms .38 caliber revolver. BMV records revealed that the automobile was titled in the name of Dantonette Hagler and the lien holder is AS. On January 31, 2011, Hagler pled guilty to "Carrying a Concealed Weapon" in Portage County Common Pleas Court case number 2010-CR-0523. CI-2 said that although Haghighi was notified through the police report that the automobile was impounded pursuant to drug and weapons violations, Haghighi returned the automobile to Hagler. BMV records show that Hagler is currently the register owner of the automobile. CI-2 knows that Haghighi was aware that CI-2 notified law enforcement. CI-2 knows that Haghighi announced to the employees at GAS/AS and to customers that CI-2 is a snitch. As a result CI-2 incurred property damage, was followed and threatened by Haghighi and others on behalf of Haghighi.

44. CI-1 and CI-2 said that in 2010, Christina O'Neal, a GAS employee was shot during the attempted repossession of an automobile. CI-2 said that the shooting took place in a known drug area in Cleveland, Ohio. CI-1 said that the shooter was the brother of a known Cleveland drug dealer. CI-1 said Haghighi had an arrangement with the drug dealer to sell him high-end automobiles and in turn the drug dealer would resale the automobile at a profit. This process would create a legitimate source of income for the drug dealer. CI-1 said Haghighi and the drug dealer had a dispute regarding an automobile that the drug dealer said was a lemon. The drug dealer would not pay for the automobile so Haghighi authorized O'Neal to repossess it. During the attempted repossession O'Neal was shot. O'Neal filed a lawsuit against Globe Auto Sales to recover damages in regard to her injuries, in Cuyahoga County Common Pleas Court case CV11751791.

45. CI-2 said in May of 2012, an Akron drug dealer was arrested pursuant to drug charges while driving a 2004 Porsche with a lien from AS. CI-2 knows that the Porsche was impounded by the Akron police department and subsequently returned to Haghighi at GAS/AS. CI-2 knows that since 2000, the Akron drug dealer had purchased numerous automobiles from Haghighi at GAS/AS, including an Escalade, Infinity and a Yukon Denali. CI-2 said the Akron drug dealer usually went to GAS/AS accompanied by his girlfriend and some of the automobiles may be titled to the girlfriend. CI-2 said in 2010, during the repossession of the Akron drug dealer's Yukon Denali, guns were drawn on CI-2 by the drug dealer's associates. CI-2 identified the Akron drug dealer and his girlfriend, by BMV driver's license photos. BMV records showed that the 2004 Porsche was titled to the girlfriend on August 15, 2011, and the 2005 Infiniti was titled to the girlfriend on July 18, 2011, both with liens by AS. Also BMV records show that the 2003 Escalade was titled to the Akron drug dealer on December 26, 2008, with a lien from AS. NCIC check shows that the Akron drug dealer has an extensive criminal record including numerous drug convictions.

46. CI-2 said there is a Cleveland drug dealer who is at GAS/AS frequently and often boasts in the presence of Haghighi and other employees, about selling drugs and using his towing business to conceal his illegal activities.  CI-2 said the Cleveland drug dealer repeatedly boasts about the trap doors he has installed in his automobiles.  CI-2 said in the past few years the Cleveland drug dealer has purchased numerous automobiles from Haghighi at GAS/AS including a Mercedes Benz, Dodge Ram, GMC Yukon Denali, Chevy Tahoe and several Corvettes.  On several occasions, CI-2 has overheard the Cleveland drug dealer ask Haghighi to loan him currency.  On or about April 19, 2013, Haghighi and the Cleveland drug dealer were in Haghighi's office at GAS/AS and CI-2 saw Haghighi give the Cleveland drug dealer a stack of currency wrapped in currency straps.  CI-2 identified the Cleveland drug dealer from his BMV driver license photo.  BMV records show that the Cleveland drug dealer purchased a 2005 Dodge Magnum, for $15,490 on July 24, 2009, a 2003 Corvette for $24,990 on November 21, 2009 and 1989 Corvette for $9,900 on March 5, 2011, from Haghighi at GAS/AS.  The Cleveland drug dealer's tax records show that the drug dealer has not filed a tax return since 2009.  The 2008 tax return has gross receipts of $10,000 and the 2009 tax return has gross receipts of $12,623, both from a towing business.  SSCU records for AS, on October 25, 2012, show a Cashier's check made payable to Auto Site, in the amount of $7,000 from the Cleveland drug dealer.

47. From 2000 to the present, CI-2 has been told by numerous GAS/AS customers that Haghighi did not require them to provide any proof of income or proof of employment for the financing of an automobile.  CI-2 was told by a customer that most of the customers list themselves as self-employed on the loan application.  CI-2 has seen customer's deal jackets at the GAS/AS business office and knows this to be true.  CI-2 was also told by customers that they paid Haghighi currency in amounts ranging from $4,000 to over $10,000, in denominations of $20 or less.  I reviewed BMV records, from 2008 through March 2013, for the purchases of automobiles by GAC, GAS and AS and the subsequent transfers of title, to create a customer list.  I know that the customer list is not complete, however a majority of the customers have been identified.  I reviewed the tax records for Haghighi's and Haghnazari's customers for the period of 2010 through 2012 and discovered that a majority of the customers either do not file tax returns or the reported income on the return does not substantiate a monthly car note.

48. CI-1 said both Haghighi and Haghnazari purchase the type of "high-end" used automobiles that are popular with drug dealers such as Mercedes Benz, Lexus, Infiniti, Hummer, BMW, Cadillac, Land Rover, Porsche, Corvette, Volvo and Jaguar.  CI-1 said that Haghighi and Haghnazari also purchase other automobiles that are popular with the drug dealer customers including any SUV model, Dodge Chargers, Dodge Magnum and the Chrysler 300.  CI-1 said that these types of automobiles are not commonly offered at the "buy here, pay here" used automobile businesses.  A review of BMV records from January 2008 through March 2013, revealed that a majority of the automobiles titled to AS and

GAC are as listed above.  BMV records show that sometime in 2008 automobiles were no longer titled to GAS.

49. CI-2 said that Nicole Stockman was a former employee of GAS/AS, who filed a sexual harassment lawsuit against Haghighi and AS.  According to Portage County Court records, Case No. 2010 CV 00764, Nicole Stockman vs. Auto Site Inc., was filed on May 14, 2010.  A former employee of AS was deposed on January 29, 2013 in connection with the lawsuit.  The former employee stated that he was an employee of AS from December of 2008 through April 2012.  The former employee said his duties included repossession work, transporting cars to and from the auctions and picking up cars from the Cleveland, East Cleveland, Beachwood, and Portage County Impound lots.  The former employee said that Haghighi frequently grabbed Nicole's breasts, in front of him, other employees and customers.  The former employee said he saw guns in the cars that he repossessed.  The former employee was asked, "Did Dave (aka Haghighi) do car deals with drug dealers, with known drug dealers?'  The former employee answered "Yeah".  The former employee stated that throughout his employment, he was verbally abused by Haghighi, often called "crack head, drug addict, sissy or faggot".  The former employee said Haghighi threatened him regarding testifying in the sexual harassment lawsuit.  Also another employee threatened him on Haghighi's behalf, regarding testifying in the sexual harassment lawsuit.

50. CI-2 said that Haghighi will "rent" an automobile to an ex-customer or an individual with whom he has an established a relationship.  CI-2 said the rental period is from a few hours to a full day and the charge ranges from about $200 to $500, in currency.  CI-2 said Haghighi only requires that the renter have a driver's license.  CI-2 said Haghighi knows that the renters' have a shady and or criminal background and thus a Global Positioning System (GPS) device is installed in every automobile that is rented.  On or about January 16, 2012, Haghighi rented an automobile to Christopher Tackett.  Tackett used the automobile as transportation to commit three home burglaries.  During the third burglary, Tackett was caught by the homeowner who called the police.  Tackett told the police that he was taking a "test drive" of the automobile, owned by AS.  Tackett plead guilty to three Counts of Burglary in Portage County Common Pleas Court case number 2012-CR-0043.  A NCIC check shows that Tackett has a criminal history of burglary, theft and drug convictions.

51. CI-2 said Haghighi pays "boosters" to steal for him.  CI-2 explained that a booster is a person who steals according to specific request.  CI-2 said Haghighi's boosters are existing GAS/AS customers or they are provided with an automobile to transport the stolen items.  CI-2 identified booster#1, from an Ohio BMV photo, as the person at GAS/AS talking to Haghighi about their stealing expertise.  In or around July 24, 2012, Haghighi asked booster#1 to drive to New York and steal Rolex watches and designer purses.  A NCIC check on booster#1 showed that booster #1 has been convicted on numerous theft charges.  Ohio BMV records show that booster#1 had an automobile titled on November 18, 2011 and the lien holder is AS.

52. Since January 2012, CI-2 has seen employees and customers at GAS/AS smoke marijuana in the rear of the building. CI-2 said Haghighi is aware that illegal drugs are being used on his property, but has done nothing to stop it.

53. In or around May 2012, CI-1 witnessed Haghighi ask a customer for some marijuana, or as Haghighi called it, "kush kush". At that time, the customer was sitting in his automobile, in the parking lot of GAS/AS and the smell of marijuana coming from inside the automobile was very strong. CI-1 knows the customer is a Cleveland area drug dealer. CI-1 saw the drug dealer give Haghighi three to four ounces of marijuana. CI-1 knows that the same drug dealer subsequently purchased an automobile from Haghighi but the title of the automobile was not placed in the drug dealer's name.

54. At the business location of GAS/AS, CI-2 heard Haghighi say to a customer, "what kind of pills you got?" CI-2 does not know the customer's response because CI-2 left the area.

55. <u>Business Activities at GAC and GAS/AS</u>
CI-1 said in late 2011 Haghighi was contacted by the bank regarding his cash deposits and since then Haghighi reduced the amount of cash that he deposits into the bank. The CI did not know which bank had contacted Haghighi. Bank records confirm a significant decrease in the cash deposits in 2011. CI-2 said Haghighi was audited in late 2011, however; the CI did not know the agency conducting the audit or whether it was pertaining to personal or business financial records. CI-2 was told by Haghighi that during the audit he did not disclose all of his bank accounts and he destroyed records that had been requested. CI-2 witnessed Haghighi burning bags in an area behind the auto body shop. A review of Internal Revenue Service records showed that there was no activity by the examination division.

56. CI-1 said Haghighi has a hidden recorder under the desk in his business office at GAS /AS. CI-1 has observed surveillance cameras at GAS /AS and GAC. CI-2 said that on May 2, 2013, Haghighi had a new ADT security system installed at GAC/AS, which includes cameras, alarms and an audio system that can be accessed remotely.

57. CI-1 said that Haghighi has two sets of books. CI-1 has observed a desktop computer in Haghighi's business office at GAS/AS and this is where Haghighi enters the information he wants to record on the business records. CI-1 has seen Haghighi with a laptop computer that he also uses at the business office of GAS/AS. Haghighi records his cash sales and information that he does not want included in the business records on his laptop computer. CI-1 and CI-2 said Haghighi takes the laptop computer with him whenever he leaves the office. CI-1 said before Haghighi purchased the laptop he used a notebook to record cash / drug dealer transactions. CI-1 said that when Haghighi meets with his drug dealer customers the door to his office is usually closed.

58. CI-2 has witnessed about ten handguns located in Haghighi's desk; one of the guns is a 40 caliber. CI-2 said that the reason that Haghighi has so many handguns is that Haghighi will accept a handgun as a payment from a customer and Haghighi keeps the guns found in the repossessed automobiles. On or about April 29, 2013, CI-2 saw a hand gun on Haghighi's desk at GAS/AS during business hours. CI-2 said Haghighi does not care who see the guns because he likes to intimidate the employees and any potential robber. In or around November 2011, the Portage County Sheriff's Office received a complaint by phone from an individual that identified themselves as an employee of GAS/AS. The caller said that a few days before the call, Haghighi was in his office at GAS/AS, waving a gun in the air and saying he was going to go "Postal", on the employees.

59. CI-2 said most of Haghighi's customers do not have automobile insurance so when they have an accident and the automobile is impounded, it is returned to GAS/AS. The CI-2 estimates that there are about 1,000 damaged automobiles located in the rear of GAS/AS and in the rear of the auto repair and auto body shop. Aerial photos show that there are hundreds of automobiles but the total is not known.

60. Automobile inventories at GAC and GAS/AS
CI-1 and CI-2 said Haghighi and Haghnazari's automobile inventory for GAC and GAS/AS is purchased at local auto auctions and is not financed. On numerous occasions, CI-1 has seen Haghighi and Haghnazari together at the auto auctions, including the Akron Auto Auction, Skipco Auction, Adesa Auction and Manheim Auction in Pennsylvania. Bank records reveal numerous check payments to these auto auctions listed above.

61. CI-1 estimates that GAS/AS has about 400 used automobiles on the lot for sale and categorizes the inventory as mid-priced to "high-end". CI-1 estimates that Globe Auto Center has about 50 used automobiles on the lot for sale and categorizes the inventory as "high-end". BMV records reveal that Haghighi and Haghnazari's automobile sales prices range from approximately $8,880 to $24,995.

62. CI-2 knows that Haghighi and Haghnazari frequently transfer automobiles between GAC and GAS/AS. From 2000 to the present, CI-2 on numerous occasions has heard Haghighi talking to Haghnazari regarding transferring automobiles. From 2000 to the present, CI-2 has transported numerous automobiles between GAS/AS and GAC business locations.

63. CI-1 and CI-2 both said that at GAS/AS, Haghighi has a GPS device installed in every automobile that is financed with a sales price of over $3,000. CI-2 said Haghighi's cost for each GPS device is $200. CI-2 said in 2011, Haghighi had a dispute with a "Cleveland" customer and the customer removed the GPS device from their automobile and the automobiles of numerous other "Cleveland"

customers. CI-2 knows that since then, Haghighi installs two GPS devices in every car financed with a sales price over $3,000. Haghighi uses his office desktop computer, his laptop computer and his iphone to access and monitor the GPS devices.

64. CI-2 said Haghnazari does not install GPS systems in automobiles at GAC. Haghnazari requires customers to sign a Form that allows GAC employees to enter the customer's private property to repossess an automobile.

65. CI-2 was told by Haghnazari that he refers all potential "Cleveland" customers to GAS. Haghnazari said the Cleveland customers are "too risky"

66. CI-2 was told by Haghnazari that he requires a minimum of $5,000 currency down payment on an automobile that is financed at GAC.

67. CI-1 said Haghighi frequently ships Mercedes Benz, models 560 or 600, to Jordan to sell because he can make a lot more profit on the sale in Jordan. Haghighi told CI-1 that he hides currency in door panels and the trunks of the Mercedes Benz that he ships to Jordan. CI-1 said in 2011, Haghighi increased the amount of currency he was shipping to Jordan, because he reduced the amount ofcurrency that he was depositing into the business bank accounts. In early June 2011, CI-1 saw a Mercedes Benz on the show room floor at GAS/AS and Haghighi told the CI-1 he was leaving to go to Jordan soon and was shipping the Mercedes Benz to Jordan. CI-1 returned to GAS/AS a few weeks later and the Mercedes Benz was no longer there. No evidence was found regarding the transporting of automobiles out of the country; however, BMV records show that various automobiles including Mercedes Benz models have been titled to AS for periods of 18 months or more.

68. Ohio BMV records reveal that the number of automobiles purchased by GAC from 2008 through 2012 was approximately 965 and the number of automobiles purchased by AS from 2009 through 2012 was approximately 1,865.

69. Employees at GAC and GAS/AS
CI-1 and CI-2 said Haghighi pays some of the employees by check and some employees in currency. The employees paid in currency do not receive a Form 1099 or Form W-2. CI-2 said that Haghighi has the currency available at the office of GAS/AS, to cash the checks of the employees that receive payroll checks.

70. CI-1 and CI-2 both identified employee #1, from an Ohio BMV photo, as an employee that has worked at GAS/AS for over 15 years. Employee#1's duties include making deposits at the bank and accepting payments from customers including currency, checks and money orders. Employee#1 utilizes GAS/AS desktop computers to record the customer payments and to perform other work duties. Both CI-1 and CI-2 have on numerous occasions witnessed employee #1 receive currency payments from customers and take the business deposits to the

bank. From 2000 to current, CI-2 has witnessed employee#1 take the currency received from a customer and rubber band the currency into bundles. Employee#1 puts the bundles of currency into 81/2 x 11 brown paper pouches or into a 10 x 4 clear plastic container and takes it into Haghighi's office. In May 2013, CI-2 saw five of the paper pouches of currency, underneath Haghighi's desk at GAS/AS. County property records show that Haghighi owns the property where employee#1 currently resides.

71. CI-1 and CI-2 both identified employee#2, from an Ohio BMV photo, as an employee that has worked at GAS/AS for over 15 years. CI-1 said employee #2 is the assistant manager and is responsible for opening the business office each day and is responsible for accepting customer payments including currency, checks and money orders. Employee#2 utilizes GAS/AS desktop computers to record the customer payments and to perform other work duties. CI-2 has witnessed on numerous occasions employee #2 placing the currency received from customers into a safe located on the floor next to employee#2's desk. On October 13, 2012, GAS/AS was burglarized and employee#2's safe was stolen. CI-2 was told by Haghighi that $60,000 in currency was actually stolen but on the police report the amount of currency was listed as $8,150. On November 1, 2012, the Portage County Sheriff's Office (PCSO) received a call from employee#2 reporting the burglary. PCSO Incident Report #1218378 lists $8,150 as the amount of cash stolen and $2,962 as the amount of checks and money orders stolen.

72. CI-2 identified employee#3, from an Ohio BMW photo, as an employee that has worked at GAS/AS since April 2012. CI-2 said employee#3 was hired to repossess automobiles and to provide security for Haghighi and for the business office of GAS/AS. CI-2 said employee#3 often brags to Haghighi and to GAS/AS employees about his extensive criminal history, which includes selling drugs. On or about June 29, 2012, employee#3 was arrested by East Cleveland Police and identified as a "person of interest" in a murder investigation. On June 29, 2012, Employee#3's truck was seized by East Cleveland Police, from the GAS/AS employee parking area, searched and dusted for finger prints. The GAS/AS employees park at the convenience store adjacent to the GAS/AS business office because there is no parking available at GAS/AS. CI-2 said employee#3 and Haghighi have a close business and personal relationship. CI-2 said employee#3 has an intimidating presence and most of the GAS/AS employees are afraid of employee#3. CI-2 knows that when Haghighi threatened employees against testifying in the sexual harassment lawsuit, he was accompanied by employee#3. CI-2 said Haghighi plans to allow employee#3 to operate the new business location in Cleveland. A NCIC check shows that employee#3 has numerous criminal convictions beginning in 1985, including drug trafficking, aggravated robbery, breaking and entering and receiving stolen property. Ohio BMV records show that employee#3's truck was titled on June 9, 2011 and the lien holder is AS.

73. CI-2 identified employee#4, from an Ohio BMV photo, as an employee that has worked at GAS/AS since April 2012. CI-2 said employee# 4 was hired to repossess automobiles and provide security at GAS/AS. CI-2 said employee#4 often brags in the presence of Haghighi and other GAS/AS employees, about his extensive criminal history, which includes selling drugs and serving a 10 year prison sentence. A NCIC check shows numerous criminal convictions, including receiving stolen property, felonious assault and aggravated trafficking.

74. In May 2013, CI-2 saw a desktop computer in the business office of Haghnazari at GAC.

75. Residences of Haghighi and Haghnazari
CI-2 knows that in 2008, Haghighi moved from his residence on Lincoln Street in Kent, Ohio into his current residence at 1242 Lake Martin Drive, Ravenna, Ohio. CI-2 knows that Haghighi personally oversaw the move of his four to five, heavily taped metal filing cabinets about four foot tall and his numerous rolled Persian rugs. During the move CI-2 saw currency bundled in cash straps in the rolled Persian rugs. CI-2 questioned Haghighi about the currency and Haghighi answered that he had "forgot" about the currency that he put in the rugs.

76. CI-2 has seen the interior of Haghighi's residence at 1242 Lake Martin Drive on numerous occasions and said there are a total of eight rooms with a spiral stair case that leads into the basement. Haghighi told CI-2 that he keeps a hand gun in every room. CI-2 said Haghighi has an elaborate security system with numerous cameras located in and outside of the property. CI-2 said Haghighi stores his garbage in the garage and he has two dogs that live in the garage.

77. CI-2 was at Haghighi's residence in December of 2012 and witnessed a gun in the kitchen, the bathroom and the laundry room. On May 2, 2013, CI-2 was shown a photo of Haghighi's residence at 1242 Lake Martin Drive and CI-2 identified the photo as the residence of Haghighi.

78. CI-2 knows that Haghighi drives automobiles titled to GAS/AS as his personal automobiles. CI-2 stated that Haghighi usually keeps the same automobile for about four months. CI-2 has seen Haghighi use his automobile to transport his laptop computer and business records.

79. CI-2 said that from abut May 2, 2013, through about July 6, 2013, Haghighi drove a silver/tan 2007 Misubishi Endeavor. On May 9, 2013, at approximately 7:15 am, surveillance was conducted by the Portage County Drug Task Force (PCDTF) and the silver/tan 2007 Misubishi Endeavor was observed parked in the driveway at 1242 Lake Martin Drive, Kent, Ohio 44240. At approximately 8:34 am,, the PCDTF observed Haghighi (identified by BMV photo) get into the automobile, drive it to the curb, get out of the automobile and pick up the morning newspaper. The PCDTF followed Haghighi driving the tan/silver Mitsubishi Endeavor, dealer plate 9310, to the Adesa Auto Auction located in Northfield, Ohio.

80. BMV records reveal that plage number 9310 is registered to Auto Site Inc, 3001 State Route 59, Ravenna, Ohio 44266. According to the BMV registration, the president of Auto Site Inc. is Davood Haghighi.

81. CI-2 said on or about July 8, 2013, Haghighi changed automobiles and began driving a tan colored, 2007 Chevrolet Tahoe. At approximately 7:15 am on July 9, 2013, PCDTF conducted surveillance at 1242 Lake artin Drive, Kent, Ohio 44240, and the officer observed a tan 2007 Chevrolet Tahoe parked in the driveway. At approximately 8:29 am on July 11, 2013, PCDTF conducted surveillance at 1242 Lake Marin Drive, Kent, Ohio 44240, and the officer observed a tan 2007 Chevrolet Tahoe parked in the driveway. At approximately 8:15 am on July 15, 2013, PCDTF conducted surveillance at 1242 Lake Martin Drive, Kent, Ohio 44240 and the officer observed a tan 2007 Chevy Tahoe, with plate number 9310, parked in the driveway.

82. In 2005, CI-2 went to Haghnazari's residence at 416 Castle Pines, Akron, Ohio to pick up an automobile and transport it to GAC. CI-2 said the automobile was parked in the driveway and CI-2 did not enter the residence. On May 2, 2013, CI-2 was shown a photo of Haghnazari's residence and identified the photo as the residence of Haghnazari.

83. On May 16, 2013, surveillance was conducted by IRS agents, at 416 Castle Pines, Akron. At approximately 9:05am, agents observed Haghnazari (identified from BMV photo) in his driveway and observed him get into a champagne colored Mercedes Benz CLS 550, with dealer plate number 6742. Agents did not follow Haghnazari but did observed the Mercedes Benz, dealer plate number 6742, parked in the parking at GAC later that same day. BMV records revealed that dealer plate number 6742 is registered to Globe Auto Center Inc, 1605 East Avenue, Akron, Ohio and the president is Davood Haghighi. The plate was registered March 31, 2013 and is valid until March 31, 2015.

## IV. SUMMARY OF FINANCIAL RECORDS

84. Tax Return information for GAC, GAS and AS
Below is a summary of the tax returns filings for GAC, GAS and AS. All of the tax returns listed below, Haghighi's and Haghnazari's Forms 1040 Tax Returns were prepared by same paid tax return preparer.

| SUMMARY OF GLOBE AUTO CENTER TAX RETURN FILINGS | | | | |
|---|---|---|---|---|
| Form | Tax Year /Period | Signor[4] | | |
| 1120S[1] | 2008 - 2011 | Haghnazari | | |
| 941[2] | 2008/03 - 2012/12 | Haghnazari | | |
| 940[3] | 2008 - 2012 | Haghnazari | | |
| (1) The Form 1120S is the U. S. Income Tax Return for an S Corporation | | | | |
| (2) The Form 941 is the Employer's Quarterly Federal Tax Return | | | | |
| (3)The Form 940 is the Employer's Annual Federal Unemployment Tax Return | | | | |

| (4) The signor on all the tax returns for GAC is Haghnazari | | |
|---|---|---|

| SUMMARY OF GLOBE AUTO SALES TAX RETURN FILINGS | | | | |
|---|---|---|---|---|
| Form | Tax Year /Period | Signor[3] | | |
| 941[1] | 2007/03 - 2008/09 | Haghighi | | |
| 940[2] | 2007 | Haghighi | | |
| (1) The Form 941 is the Employer's Quarterly Federal Tax Return | | | | |
| (2) The Form 940 is the Employer's Annual Federal Unemployment Tax Return | | | | |
| (3) The signor on all the tax returns for GAS was Haghighi | | | | |
| No Corporation Tax Return, Partnership Tax Return or Schedule C- Profit or Loss from business of Sole Proprietorship was filed for GAS | | | | |

| SUMMARY OF AUTO SITE TAX RETURN FILINGS | | | | |
|---|---|---|---|---|
| Form | Tax Year /Period | Signor[3] | | |
| 941[1] | 2008/09 - 2012/12 | Haghighi | | |
| 940[2] | 2008 - 2012 | Haghighi | | |
| (1) The Form 941 is the Employer's Quarterly Federal Tax Return | | | | |
| (2) The Form 940 is the Employer's Annual Federal Unemployment Tax Return | | | | |
| (3) The signor on all the tax returns for AS was Haghighi | | | | |
| No Corporation Tax Return, Partnership Tax Return or Schedule C- Profit or Loss from business of Sole Proprietorship was filed for AS | | | | |

85. The table below is a summary of the information reported on the Globe Auto Center, Form 1120S for the years 2008 through 2011. The Form 1120S for Globe Auto Center for the year 2012 had not been filed as the date of this affidavit.

86. Haghnazari signed Forms 1120S as president, for the years the 2009 through 2011 and for 2008 Haghnazari signed the return without any officer designation. According to the amounts reported on Forms 1120S, for the years 2008 through 2011, GAC has sustained a total loss of $989,540.

87. The GAC, Form 1120S, Schedule K, shows that Haghighi and Haghnazari are equal, 50 percent shareholders' of GAC

| SUMMARY OF TAX RETURNS FOR GLOBE AUTO CENTER FOR THE YEARS 2008 - 2011 | | | | |
|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 |
| GROSS RECEIPTS | $ 2,768,121 | $ 1,837,092 | $ 1,817,917 | $ 1,813,195 |
| LESS: COGS | $ 2,528,886 | $ 1,809,941 | $ 1,752,150 | $ 1,770,963 |
| TOTAL INCOME | $   239,235 | $      27,151 | $      65,767 | $      42,232 |
| | | | | |
| DEDUCTIONS/EXPENSES | | | | |
| Officers Compensation | $     96,000 | $      96,000 | $      96,000 | $      96,000 |
| Salaries | $     18,200 | $      18,200 | $      18,200 | $      18,200 |
| Bad Debts | $   275,607 | $    114,824 | $    114,159 | $      75,555 |

| | | | | |
|---|---|---|---|---|
| Rents | $ 33,600 | $ 33,600 | $ 33,600 | $ 33,600 |
| Taxes/Licenses | $ 11,941 | $ 11,294 | $ 10,917 | $ 11,351 |
| Other | $ 35,499 | $ 37,171 | $ 34,186 | $ 40,221 |
| Total Deductions/Expense | $ 470,847 | $ 411,089 | $ 307,062 | $ 274,927 |
| | | | | |
| ORDINARY BUSINESS NET INCOME/(LOSS) | $ (231,612) | $ (283,938) | $ (241,295) | $ (232,695) |
| | | | | |
| | | | | |
| Schedule K - Interest Income[1] | $ 252,620 | $ 319,765 | $ 305,420 | $ 304,128 |

[1] This is the interest that is earned by GAC from financing automobiles

88. Tax Return Summary for HAGHIGHI (Forms 1040)

The table below is a summary of Haghighi's Form 1040 U.S. Individual Income Tax Returns for the years 2005 through 2011.  Haghighi's Form 1040 for the year 2012 was not filed as of the date of this affidavit.

89. The summary shows that Haghighi reports W-2 wages from GAC in the years 2005–2011; from GAS in the years 2005-2008 and from AS in the years 2008-2011.

90. Haghighi's reported losses are a flow through amount from the GAC Form 1120S and are included on his Form 1040 on the line titled - S-Corp/Rents/ Royalties. Haghighi's reported interest income is also a flow through amount from the GAC Form 1120S, Schedule K and is included on his Form 1040 on the line titled - Taxable Interest.

91. Haghighi does not take a regular salary from any of the businesses but instead takes sporadic salary payments in the amounts of $1,000 to $72,000.  In addition Haghighi makes sporadic deposits to the business accounts from his personal accounts and has a massive commingling scheme between the business and personal bank accounts.  Haghighi also pays his personal expenses from the GAS and AS bank accounts.

| SUMMARY OF TAX RETURNS FOR DAVOOD HAGHIGHI FOR THE YEARS 2005 - 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| Wages (Auto Site, Globe Auto Sales, Globe Auto Center)[1] | $ 96,996 | $ 132,000 | $ 132,000 | $ 116,000 | $ 129,200 | $ 132,000 | $ 132,000 |
| Taxable Interest (from Globe Auto Center)[2] | $ 91,235 | $ 84,764 | $ 89,771 | $ 126,311 | $ 159,882 | $ 152,711 | $ 152,073 |
| Capital Gain[3] | | $ 28,553 | $ 13,374 | $ 7,358 | $ 2,142 | $ 73,697 | $ 43,569 |
| S-Corp./Rents[4]/Royalties | $ (79,278) | $ (90,332) | $ (67,546) | $ (111,435) | $ (135,841) | $ (120,614) | $ (116,348) |
| | | | | | | | |
| Total Income | $ 108,953 | $ 154,988 | $ 167,596 | $ 138,234 | $ 155,556 | $ 237,837 | $ 211,347 |
| | | | | | | | |
| Adjusted Gross Income | $ 108,953 | $ 154,988 | $ 167,596 | $ 138,234 | $ 155,556 | $ 237,837 | $ 211,347 |
| | | | | | | | |
| Schedule A Deduction | $ 17,811 | $ 29,273 | $ 30,235 | $ 29,273 | $ 28,948 | $ 31,974 | $ 36,438 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Exemptions | $ 3,200 | $ 3,212 | $ 3,173 | $ 3,500 | $ 3,650 | $ 3,650 | $ 3,700 |
| Taxable Income | $ 87,942 | $ 122,503 | $ 134,188 | $ 105,461 | $ 122,958 | $ 202,213 | $ 171,236 |
| Tax Owed | $ 19,126 | $ 25,947 | $ 30,131 | $ 22,557 | $ 28,126 | $ 45,550 | $ 44,447 |
| Disposable Income[5] | $ 68,816 | $ 96,556 | $ 104,057 | $ 82,904 | $ 94,832 | $ 156,663 | $ 126,762 |
| (1)Wages - Auto Site | | | | $ 32,000 | $ 93,200 | $ 96,000 | $ 96,000 |
| Wages - Globe Auto Sales | $ 60,996 | $ 96,000 | $ 96,000 | $ 48,000 | | | |
| Wages - Globe Auto Center | $ 36,000 | $ 36,000 | $ 36,000 | $ 36,000 | $ 36,000 | $ 36,000 | $ 36,000 |
| TOTAL | $ 96,996 | $ 132,000 | $ 132,000 | $ 116,000 | $ 129,200 | $ 132,000 | $ 132,000 |
| (2) This is a flow through item from the 1120S - interest from seller financed loans to car buyers | | | | | | | |
| (3) From Scot trade Account | | | | | | | |
| (4) The number of rental properties listed on Schedule E | 7 rentals | 6 rentals | 6 rentals | 5 rentals | 5 rentals | 5 rentals | 7 rentals |
| (5) Disposable income is calculated as Adjusted Gross Income Less Schedule A Deductions, Exemptions and Taxes Owed | | | | | | | |

92. Tax Return Summary for Haghnazari (Form 1040)

The table below is a summary of Haghnazari's Form 1040 U.S. Individual Income Tax Returns for the years 2005 through 2011. Haghnazari's Form 1040 for the year 2012 was not filed as of the date of this affidavit.

93. The summary shows that Haghighi reports W-2 wages from GAC in the years 2005–2011.

94. Haghnazari's reported losses are a flow through amount from the GAC Form 1120S and are included on his Form 1040 on the line titled - S-Corp/Rents/ Royalties. Haghighi's reported interest income is also a flow through amount from the GAC Form 1120S, Schedule K and is included his Form 1040 on the line titled - Taxable Interest.

| SUMMARY OF TAX RETURNS FOR BEHNAM HAGHNAZARI FOR THE YEARS 2008 - 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| Wages (Globe Auto Center) | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| Taxable Interest (from Globe Auto Center)[1] | $ 91,201 | $ 84,764 | $ 89,817 | $ 126,310 | $ 159,882 | $ 152,810 | $ 152,270 |
| Capital Gain[2] | $ 14,110 | | | | | $ 100,958 | $ (2,767) |
| S-Corp./Rents[3]/Royalties | $ (67,271) | $ (71,242) | $ (42,834) | $ (83,656) | $ (159,882) | $ (88,527) | $ (84,227) |
| Total Income | $ 96,790 | $ 73,522 | $ 106,983 | $ 102,654 | $ 110,063 | $ 225,241 | $ 125,276 |
| Adjusted Gross Income | $ 96,790 | $ 73,522 | $ 97,270 | $ 92,670 | $ 110,063 | $ 225,241 | $ 125,276 |
| Schedule A Deduction | $ 40,455 | $ 35,219 | $ 33,734 | $ 35,074 | $ 35,108 | $ 36,599 | $ 37,784 |
| Exemptions | $ 9,600 | $ 9,900 | $ 10,200 | $ 10,500 | $ 10,950 | $ 10,950 | $ 11,100 |
| Taxable Income | $ 46,735 | $ 28,403 | $ 53,336 | $ 47,410 | $ 64,005 | $ 177,692 | $ 76,392 |

| Taxes Owed | $ 3,870 | $ 3,509 | $ 7,216 | $ 6,311 | $ 8,769 | $ 27,644 | $ 11,144 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Disposable Income[4] | $ 42,865.00 | $ 24,894.00 | $ 46,120.00 | $ 40,785.00 | $ 55,236.00 | $ 150,048.00 | $ 65,248.00 |
| | | | | | | | |
| (1) This is a flow through item from the 1120S - interest from seller financed loans to car buyers | | | | | | | |
| (2) From sale of real estate | | | | | | | |
| (3) The number of rental properties listed on Schedule E | 1 rental | 1 rental | 1 rental | 1 rental | 1 rental | 1 rental | 1 rental |
| (4) Disposable income is calculated as Adjusted Gross Income less Schedule A Deductions, Exemptions and Taxes owed | | | | | | | |

## Bank Accounts for GAC, GAS and AS

95. Chase Bank – GAC
Bank records show that Haghighi opened a business account for Globe Auto Center at Bank One, account number XXXXX4065, on July 17, 1990. Davood Haghighi is listed as the sole signor on the account. Bank One was later purchased by J. P. Morgan Chase Bank (Chase Bank); however the account number remained the same.

96. Since March 2009, Chase Bank has filed three Currency Transaction Reports (CTR's) in regard to the GAC business Chase bank account number XXXX4065 and Haghighi's individual Chase bank account # XXXXX8610 for deposits made to these accounts exceeding $10,000. The last CTR was filed on June 22, 2010 for deposits made totaling $10,700 to the above listed accounts.

97. PNC-GAC
Bank records show that Haghnazari opened a business account for Globe Auto Center, National City Bank (NCB), account number XXXXX5219, on April 23, 2003. On or about April 10, 2010, NCB was purchased by PNC and the account number was changed to XXXXX9118. Behnam Haghnazari is the sole signor on the account. The activity in the account is sporadic.

98. Chase Bank–GAS
Bank records show that Haghighi opened a business account for Globe Auto Sales Inc. at J. P. Morgan Chase Bank (Chase Bank), account number XXXXX0639, on July 28, 2006. Davood Haghighi is listed as the sole signor on the account.

99. A review of Chase bank records for the period September 3, 2008 through March 31, 2009, revealed 121 cash deposits were made, totaling $883,518. The deposit activity showed numerous structured cash transactions made in a manner to avoid the CTR requirements. The amounts of the cash deposits ranged from $3,720 to $9,500.

100. Further review of Chase bank records also revealed that from August 28, 2006 through March 31, 2009 that there was pattern of structuring cash transactions in a manner to avoid CTR requirements.

101. SSCU - AS
Bank records show that Haghighi opened a business account for Auto Site Inc. at Seven Seventeen Credit Union (SSCU), account number XX0505, on July 23, 2008.  Davood Haghighi is listed as the sole signor on the account.  The mailing address on this account is 1242 Lake Martin Drive, Kent, Ohio 44240, which is Haghighi's residence.

102. A review of SSCU records for the period from April 2009 through May 9, 2013, revealed that there is a continuing pattern of large cash deposited into the AS bank account.  From the period January 15, 2013 through May 9, 2013, 80 cash deposits were made totaling $509,939.  The deposit activity showed numerous structured cash transactions made in a manner to avoid the CTR requirements.  The cash deposits ranged from $1,850 to $9,000.

103. The table below is a summary of the total business bank deposits less transfers between business bank accounts, for the years 2008 through 2012.  The summary shows that over $1,132,800 was commingled between the business accounts for the years 2008 through 2012.  I know that extensive commingling is not common with independently operating businesses.

| SUMMARY OF TOTAL THE BANK DEPOSITS FOR THE YEARS 2008 - 2012 | | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 5 Year Total |
| Chase Bank - Globe Auto Center #XXXXX4065 | $ 2,514,146 | $ 2,006,792 | $ 1,939,055 | $ 1,982,821 | $ 1,845,403 | $ 10,288,217 |
| Less transfers | $ 62,950 | $ 10,935 | $ 58,355 | $ 19,600 | $ - | $ 151,840 |
| Net deposits - Globe Auto Center#XXXXX4065 | $ 2,451,196 | $ 1,995,857 | $ 1,880,700 | $ 1,963,221 | $ 1,845,403 | $ 10,136,377 |
| | | | | | | |
| NCB / PNC - Globe Auto Center #XXXXX9118 | $ 109,752 | $ 9,700 | $ 10,342 | $ 15,612 | $ 6,825 | $ 152,231 |
| | | | | | | |
| Chase Bank - Globe Auto Sales #XXXXX0639 | $ 4,287,372 | $ 3,949,342 | $ 2,522,414 | $ 1,399,701 | $ 820,120 | $ 12,978,949 |
| Less transfers | $ 28,000 | $ 252,500 | $ 315,500 | $ 36,000 | $ - | $ 632,000 |
| Net deposits - Globe Auto Sales #XXXXX0639 | $ 4,259,372 | $ 3,696,842 | $ 2,206,914 | $ 1,363,701 | $ 820,120 | $ 12,346,949 |
| | | | | | | |
| SS Credit Union - Auto Site #XX0505 | $ 9,000 | $ 1,787,108 | $ 3,223,322 | $ 3,026,971 | $ 3,219,835 | $ 11,266,236 |
| Less transfers | | $ 48,500 | $ 260,000 | $ 40,500 | $ - | $ 349,000 |
| Net deposits - Auto Site #XX0505 | $ 9,000 | $ 1,738,608 | $ 2,963,322 | $ 2,986,471 | $ 3,219,835 | $ 10,917,236 |

104. The table shown below is a summary of the total currency deposits for all business bank accounts, for the years 2008 through 2012 is shown below.

| SUMMARY OF TOTAL THE CURRENCY DEPOSITS  FOR THE YEARS 2008 - 2012 | | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 5 Year Total |
| Chase Bank - Globe Auto Center #XXXXX4065 | $    650,925 | $    606,418 | $    599,579 | $    583,600 | $    461,784 | $    2,902,306 |
| NCB / PNC - Globe Auto Center #XXXXX9118 | $     29,800 | $      7,700 | $      5,900 | $      7,450 | $      3,200 | $       54,050 |
| Chase Bank - Globe Auto Sales #XXXXX0639 | $  1,523,720 | $  1,352,226 | $    784,200 | $    492,597 | $    261,415 | $    4,414,158 |
| SS Credit Union - Auto Site #XX0505 | $      3,000 | $    656,045 | $    967,892 | $    833,814 | $    826,804 | $    3,287,555 |

105. Structuring Activity

The deposits analysis revealed a consistent pattern of structuring of deposits into each of the business bank accounts as well as the between the business accounts.  As discussed earlier GAS and AS operate from the same location and no business returns have been filed for either entity.  The separate business banks accounts are utilized as a ploy to avoid the currency transaction reporting requirements.  From 2000 until the present, CI-2 has observed Haghighi prepare the bank deposit tickets for the GAS Chase Bank deposits, the AS - SSCU deposits and for the prior bank account deposits at First Merit Bank.  CI-2 said only Haghighi prepares the deposit tickets for GAS and AS.  The table below is a sample of the deposit structuring for the years 2010 through 2012.

| STRUCTURING OF BANK DEPOSITS FOR GAS,AS and GAC | | | | | |
|---|---|---|---|---|---|
| | | Chase Bank | SSCU | Chase Bank | PNC Bank |
| | | 715130639 | 340505 | 100084065 | 4221469118 |
| Item | Post Date | Globe Auto Sales | Auto Site | Globe Auto Center | Globe Auto Center |
| 1 | 02/22/2010 | $8,300.00 | $7,900.00 | $4,500.00 | $4,400.00 |
| | 02/23/2010 | $7,000.00 | $8,600.00 | $5,350.00 | |
| | | | | | |
| 2 | 04/15/2010 | $8,050.00 | $7,850.00 | $2,090.00 | |
| | 04/16/2010 | $6,870.00 | $6,620.00 | $1,850.00 | |
| | | | | | |
| 3 | 11/15/2010 | | $7,850.00 | $3,200.00 | |
| | 11/16/2010 | $3,275.00 | $6,500.00 | | |
| | | | | | |
| 4 | 02/07/2011 | $7,500.00 | $6,550.00 | $6,900.00 | |
| | 02/08/2011 | $5,800.00 | $3,400.00 | $5,920.00 | |
| | | | | | |
| 5 | 04/14/2011 | $7,710.00 | $5,060.00 | $5,840.00 | |
| | 04/15/2011 | $7,400.00 | $5,840.00 | | |
| | | | | | |
| 6 | 11/21/2011 | $7,250.00 | $4,800.00 | $1,800.00 | |
| | | | | | |
| 7 | 02/05/2012 | | $8,800.00 | | |

| | | | | |
|---|---|---|---|---|
| | 02/06/2012 | | $5,550.00 | $4,780.00 |
| | | | | |
| 8 | 03/26/2012 | | $8,900.00 | $4,800.00 |
| | 03/27/2012 | $2,000.00 | $6,800.00 | |
| | | | | |
| 9 | 12/17/2012 | | $9,260.00 | |
| | 12/18/2012 | $4,140.00 | $5,860.00 | |

106. Transactions requiring the filing of Form 8300

A search was conducted for all Forms 8300 filed since the year 2004, for Globe Auto Sales, Globe Auto Center, Auto Site, Behnam Haghnazari and Davood Haghighi . Only one Form 8300 was found, which was filed for Globe Auto Center dated November 6, 2006 and signed by Jerry West.  A CTR was also filed on the same date by Chase Bank and signed by Gerald (Jerry) West. West is a former GAC employee, who is deceased.

107. On November 8, 2011, an Internal Revenue Service Undercover Agent (IRS-UCA) met with Haghnazari, at GAC, in a meeting that was monitored and recorded.  The IRS-UCA offered Haghnazari currency of $15,000 for the purchase of an automobile.  Haghnazari told the IRS-UCA that he did not want the payment in the form of currency, because he had to report any currency transaction over $10,000 to the Internal Revenue Service.  The IRS undercover operation was unsuccessful, however as discussed in item 27, the IRS-UCA did have a prior referral.

108. As discussed in item 32 and 33, Haghighi did not file a Form 8300 for the transaction with CI-1.  Haghighi demonstrated his knowledge of the Form 8300 filing requirement by reducing the amount of the transaction below the $10,000 reporting requirement.

109. Chase bank records revealed Summit Federal Credit Union Cashier's Check #441394, dated July 14, 2010, made payable to Globe Auto Center, in the amount of $17,569.50.  The remitter on the check is listed as Sam Obradovich and the notation in the memo section was "2008 Mazda CX7".  The check was deposited into the GAC Chase bank account on July 15, 2010.  BMV records verify that Obradovich registered a 2008 Mazda CX7 on July 27, 2010.  No Form 8300 was filed for this transaction.

110. Chase bank deposit records revealed US Bank Cashier's Checks #357502736 and #357502737, both dated October 28, 2010 and made payable to Global (Globe) Auto Center for $5,000 each.  Cashier's Check #357502737 was deposited into the GAC bank account on November 1, 2010 and Cashier's Check # 357502736 was deposited into the GAC Chase bank account on November 3, 2010.  The remitter on both the Cashier's Checks is listed as Alonzo Sykes.  According to BMV records no automobile was registered to Sykes during this time period.  A NCIC check shows that Sykes has an

extensive history of drug related convictions.  Although this transaction is not over $10, 000, as required by Form 8300, the total of exactly $10,000 is suspiciously close.

111.  Chase bank deposit records revealed Charter One Cashier's Check # 30743236-8, dated December 19, 2011, in the amount of $9,500 and Charter One Cashier's Check # 530699951-6, dated December 21, 2011, in the amount of $6,835, both, made payable to Globe Auto, deposited on December 22, 2011, into the Chase bank GAC account.  In the memo section of both of the checks is the notation "2005 BMW X5".  No Form 8300 was filed for this transaction.  A review of BMV records revealed the purchaser of the automobile and a NCIC check revealed that the purchaser has a history of drug convictions.

112.  <u>Bank Account activity for Haghighi</u>
According to Chase bank records, account # XXXXX8610 was opened on June 25, 1999 and the sole signor on the account is listed as Davood Haghighi.  A review of bank records for the years 2008 through 2012 show that there was no cash taken from deposits, no checks to cash and no ATM withdrawals, however there were currency deposits in the amount of $44,830 in 2008; $70,060 in 2009; $47,840; in 2010; $34,500 in 2011 and $35,860 in 2012.  The only known source of currency that Haghighi has access to is the currency receipts of GAC, GAS and AS.  Based on the activity in this account, it is probable that Haghighi took currency from the GAC, GAS or AS that was not deposited into the business bank accounts and not reported on his Form 1040 Tax Returns.

113.  <u>Bank Account activity for Haghnazari</u>
According to PNC bank records, account # XXXXX6179 was opened on April 23, 2003 and the signors on the account are listed as Behnam Haghnazari and Sogoli Haghnazari.  A review of bank records for the years 2008 through 2012 revealed that customer's checks for payments on automobiles were made payable to Behnam Haghnazari and deposited into the account.  In addition the review revealed that there was no cash taken from deposits, no checks to cash and no ATM withdrawals, however there were currency deposits in the amount of $10,300 in 2008; $8,020 in 2009; $2,000; in 2010; $6,400 in 2011 and $5,700 in 2012.  A review of Haghnazari's Huntington bank mortgage records revealed that he made mortgage payments with currency of $2,906 in 2008, $6,110 in 2009 and $3,010 in 2010.  The only known source of currency that Haghnazari has access to is the currency receipts of GAC, GAS and AS.  Based on the currency deposits and the currency used to pay the mortgage, it is probable that Haghnazari took currency from the GAS, AS or GAC that was not deposited into the business bank accounts and not reported on his Form 1040 Tax Returns.

## V. LOCATIONS WHERE EVIDENCE OF THE VIOLATIONS MAY BE FOUND

114. The following sets forth the locations, vehicles and persons to be searched for evidence, fruits, and instrumentalities of the above criminal offenses against the United States:

a. 1605 East Avenue, Akron, Ohio 44314 - Globe Auto Center, Inc.

    i. Information provided by CI-1 and CI-2, surveillance, county real estate records, bank records, addresses on tax returns and other evidence as discussed in the probable cause section of this affidavit, shows that Haghnazari operates a used automobile business at this location. County real estate records show that Haghighi is the owner of this location.

    ii. This location consists of one main structure on the property that holds the offices of the used car business. The building contains office space that is used to operate the business, as well as an area that is used to make repairs to the used automobiles. Automobiles that are for sale are parked on the property around the physical structure. Affiant requests authority to search all vehicles on the premises including automobile inventory, automobiles brought in for repair, and damaged automobiles on the premises at the time this search warrant is executed.

    iii. A more detailed description of the business located at 1605 East Avenue, Akron, Ohio 44314, as well a digital photograph of the property is attached to the Search Warrant and Search Warrant Application.

b. 3001 St. Route 59, Ravenna, Ohio 44266 - Globe Auto Sales, Inc., Auto Site Inc.

    i. Information provided by CI-1 and CI-2, surveillance, county real estate records, bank records, addresses on tax returns and other evidence as discussed in the probable cause section of this affidavit, shows that Haghighi operates his used automobile business at this location. County real estate records show that Haghighi is the owner of this location.

    ii. The main structure on this property contains an automobile show room with employee desks, as well as a private office of Haghighi. The property has a black fence enclosing the main structure and the used automobiles that are for sale. Affiant requests authority to search all vehicles on the premises including automobile inventory, automobiles

31

brought in for repair, and damaged automobiles on the premises at the time this search warrant is executed.

iii. There is a storage building located behind the main structure on this property.  Haghighi has as recently as May 2013 used this building to repair his used automobile inventory.

iv. A more detailed description of the business and physical structures located at 3001 State Route 59, Ravenna, Ohio 44266, as well a digital photograph of the property is attached to the Search Warrant and Search Warrant Application.

c. <u>2907 State Route 59, Ravenna, Ohio 44266 - Auto Body Shop</u>

i. Information from CI-2, surveillance, tax return information, county real estate records and other evidence as discussed in the probable cause section of this affidavit, shows that Haghighi is the owner of this property.

ii. Haghighi operated an auto body repair shop at this location until 2011. Haghighi currently uses this building for storage of a boat and other unknown items.  Affiant requests authority to search all vehicles on the premises including automobile inventory, automobiles brought in for repair, and damaged automobiles on the premises at the time this search warrant is executed.

iii. A more detailed description of the business located at 2907 State Route 59, Ravenna, Ohio 44266, as well a digital photograph of the property is attached to the Search Warrant and Search Warrant Application.

d. <u>2899 State Route 59, Ravenna, Ohio 44266 - Auto Repair Shop</u>

i. Information from CI-2, surveillance, county real estate records, tax return information and other evidence discussed in the probable cause section of this affidavit shows that Haghighi is the owner of this property.

ii. Haghighi uses this location for the repair of his used automobile inventory and records pertaining to the automobile repair are maintained at this location. Affiant requests authority to search all vehicles on the premises including automobile inventory, automobiles brought in for repair, and damaged automobiles on the premises at the time this search warrant is executed.

iii. A more detailed description of the business located at 2899 State Route 59, Ravenna, Ohio 44266, as well a digital photograph of the

property is attached to the Search Warrant and Search Warrant Application.

e. 2<u>1242 Lake Martin Drive, Kent, Ohio 44240, Residence of Davood Haghighi</u>

    i. Information from CI-2, surveillance, county real estate records, bank records, the addresses on tax returns and other evidence, as discussed in the probable cause section of this affidavit, shows that this property is owned by Haghighi and he uses the property as his primary residence.

    ii. A more detailed description of residence located at 1242 Lake Martin Drive, Kent, Ohio 44240, as well a digital photograph of the property is attached to the Search Warrant and Search Warrant Application.

f. <u>416 Castle Pines Drive, Akron, Ohio 44333, Residence of Behnam Haghnazari</u>

    i. Information provided by CI-1 and CI-2, surveillance, county property records, bank records, addresses on tax returns and other evidence as discussed in the probable cause section of this affidavit, shows that this property is owned by Haghnazari.  The investigation has shown that Haghnazari uses this property as his primary residence along with his wife, Sogoli  Haghnazari and their children.

    ii. A more detailed description of business located at 1242 Lake Martin Drive, Kent, Ohio 44240, as well a digital photograph of the property is attached to the Search Warrant and Search Warrant Application.

g. <u>2007 Tan Chevrolet Tahoe</u>

    i. Information provided by CI-2, surveillance and other evidence as discussed in the probable cause section of this affidavit shows that this automobile is being driven by Haghighi.  The 2007 Tan Chevrolet Tahoe was seen at 1242 Lake Martin Drive, Ravenna, Ohio, which is Haghighi's residence, on July 15, 2013.

    ii. A more detailed description of the automobile as well as a digital photograph is attached to the Search Warrant and Search Warrant Application.

h. <u>Person of Davood Haghighi</u>

Davood Haghighi has been identified by BMV photograph by both CI-1 and CI-2.  Haghighi is approximately 53 years old, 5'7" and 170 lbs.  He has dark brown hair and brown eyes.  A BMV photograph of Davood Haghighi is attached to the Search Warrant and Search Warrant Application.

i.  <u>Person of Behnam Haghnazari</u>

Behnam Haghnazari has been identified both CI-1 and CI-2 by BMV photograph. Haghnazari is approximately 47 years old, 5'11" and 192 lbs. He has brown hair and brown eyes. A BMV photograph of Behnam Haghnazari is attached to the Search Warrant and Search Warrant Application.

CONCLUSION

Based on my knowledge and experience as a Special Agent and the facts set forth in the affidavit, I believe there is probable cause that violations of the following United States criminal statutes have been and continue to be committed by the subjects Davood Haghighi, Behnam Haghnazari, and others:

- Title 18 USC § 1956(a)(1)(A)(i): Money Laundering;
- Title 18 USC § 1956(a)(1)(B)(i): Monetary Laundering ;
- Title 18 USC § 1956(a)(1)(B)(ii):Money Laundering involving reporting requirements;
- Title 18 USC § 1956(a)(3)(A),(B),(C): Money Laundering of funds from a specified unlawful activity;
- Title 18 USC  § 1956(h): Conspiracy to Launder  Monetary Instruments;
- Title 18 USC § 1957: Engaging in Monetary Transactions in property derived from a specified unlawful activity;
- Title 18 USC § 371: Conspiracy;
- Title 31 USC § 5313:  Currency Transaction Reports;
- Title 31USC § 5324: Structuring to avoid Currency Transaction Reports;
- Title 31 USC § 5331 and Title 26 § 6050I: Merchant reporting requirement - Form 8300;
- Title 26USC § 7201: Attempt to Evade or Defeat Tax;
- Title 26 USC § 7202: Failure to Collect or Pay over Tax;
- Title 26 USC § 7206(1): Fraud and False tax Returns

I further believe that evidence of the above criminal offenses, described in Attachment B to the Search Warrant and Search Warrant Application and incorporated by reference, will be found at and/or within the following locations and vehicles or in the possession of the following persons:

- 1605 East Avenue, Akron, Ohio 44314, Globe Auto Center Inc.;

- 3001 St. Route 59, Ravenna, Ohio 44266, Globe Auto Sales Inc., Auto Site Inc.;

- 2907 State Route 59, Ravenna, Ohio 44266, Auto Body Shop;

34

- 2899 State Route 59, Ravenna, Ohio 44266, Auto Repair Shop;

- 1242 Lake Martin Drive, Kent, Ohio 44240, Residence of Davood Haghighi;

- 416 Castle Pines Drive, Akron, Ohio 44333, Residence of Behnam Haghnazari;

- 2007 Tan Chevrolet Tahoe;

- Person of Davood Haghighi;

- Person of Behnam Haghnazari.

Accordingly, I respectfully request that this Honorable Court issue nine search warrants for the aforementioned premises, vehicle and persons, which and who are described in Attachment A of the Search Warrant Application, and the proposed Warrant.  Further, I request that the Warrant order the seizure of evidence of the aforementioned criminal offenses, including evidence and items listed in Attachment B submitted herewith and also attached to the Search Warrant and Search Warrant Application.

I further request that this Honorable Court order that all papers in support of Application, including the Affidavit, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their disclosure may seriously jeopardize the investigation and the safety of confidential informants.

SA Jennifer A. Higgins
Internal Revenue Service
Criminal Investigation

Sworn to and subscribed to before me this _16th_ day of July, 2013.

John R. Adams
United States District Judge